USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 08/13/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MAHMOUD MANSOUR AHMED ELGENDY,

Petitioner,

-against-

LADEON FRANCIS, et al.,

Respondents.

26-CV-4716 (MMG)

**OPINION & ORDER**

MARGARET M. GARNETT, United States District Judge:

Petitioner is an Egyptian national who entered the United States in September 2024. After over a year in detention, Mr. Elgendy petitioned the U.S. District Court for the Eastern District of Virginia ("EDVA") for a writ of habeas corpus, which was granted in April 2026. Mr. Elgendy was released under an order of supervision but was re-detained on June 4, 2026, after DHS identified a third country for his imminent removal. The same day, Mr. Elgendy filed the present Petition pursuant to 28 U.S.C. § 2241, which he amended shortly thereafter (the "Petition"). Mr. Elgendy seeks, *inter alia*, an order directing his immediate release because the Government violated his Fifth Amendment rights to due process. For the following reasons, the Court GRANTS the Petition and ORDERS Mr. Elgendy's release under the terms described in his April 15, 2026, Order of Supervised Release.

1

## BACKGROUND

### I.    RELEVANT FACTS[1]

Mr. Elgendy is a 22-year-old Egyptian citizen who entered the United States on September 16, 2024, apparently on foot from Mexico and without authorization, and was immediately placed in expedited removal proceedings.  Dkt. No. 4 ("Pet") ¶ 1; Dkt. No. 13 ("Shanahan Decl.") ¶ 4; Dkt. No. 12-1 (Expedited Removal Order).  Mr. Elgendy was encountered by a U.S. Customs and Border Protection agent near San Ysidro, California.  Shanahan Decl. ¶ 4.[2]  Mr. Elgendy was taken into custody, transferred to San Diego for further processing, and served with a Notice and Order of Expedited Removal the next day pursuant to the expedited removal process delineated in 8 U.S.C. § 1225(b)(1).  Shanahan Decl. ¶ 4.

On October 22, 2024, Mr. Elgendy was transported to a detention facility in Bowling Green, Virginia after stopping along the way at facilities in Mississippi and Texas.  Shanahan Decl. ¶¶ 5–7.  On October 25, 2024, Mr. Elgendy asserted a fear of returning to Egypt and was given a credible fear interview, at which an asylum officer found that Mr. Elgendy had demonstrated a credible fear of persecution or torture if removed to Egypt.  *Id.* ¶¶ 8–9.

On November 1, 2024, following his credible fear interview, DHS issued Mr. Elgendy a Notice to Appear ("NTA") in removal proceedings.  Pet. ¶ 23; Dkt. No. 12-2 (NTA).  On April 4, 2025, an Immigration Judge ("IJ") denied Mr. Elgendy's application for asylum and ordered him removed from the United States, but granted withholding of removal to Egypt.  Pet. ¶ 23; Dkt.

---

[1] The following facts are taken from the Petition and declarations accompanying the briefs of the parties.  *See* Dkt. Nos. 1, 13–14.

[2] Mr. Elgendy was thought to have entered the United States from Mexico.  This suspicion was later confirmed by Mr. Elgendy in his April 4, 2025 merits hearing in immigration court.  *See* Dkt. No. 27-2.

2

No. 12-3 (IJ Order). Mr. Elgendy and DHS both waived their rights to appeal, making the removal order final that day. Pet. ¶ 23.

DHS held Petitioner at the Caroline Detention Facility in Virginia while it endeavored to identify a third country for his removal.[3] *Id.* ¶ 29. On November 24, 2025, Petitioner filed a writ of habeas corpus in the U.S. District Court for the Eastern District of Virginia, arguing that he should be released from detention because his removal was not likely to occur in the reasonably foreseeable future. Pet. ¶ 31; Shanahan Decl. ¶ 24. Judge Allen issued an order enjoining Mr. Elgendy's removal or transfer from the district without that court's permission. *See* Dkt. No. 4-10.

While the Petition was pending, DHS conducted 90-day and 180-day post-order custody reviews, pursuant to 8 U.S.C. 1231(a)(1), and determined that Mr. Elgendy should remain detained. Dkt. Nos. 12-4–12-5. ICE reviewed Petitioner's detention again on February 24, 2026, and notified him on March 25, 2026 that he would remain detained because ICE was "actively working" with DHS to effectuate Mr. Elgendy's removal to a third country. Dkt. No. 12-6. On April 3, 2026, ICE notified Mr. Elgendy of its intent to remove him to Equatorial Guinea. Shanahan Decl. ¶ 28; Dkt. No. 4-6 (Notice of Removal). Five days later, after Mr. Elgendy expressed a fear of removal to Equatorial Guinea, United States Citizenship and Immigration Services ("USCIS") conducted a credible fear interview pursuant to 8 U.S.C. § 1225(b)(1)(B)(i) and 8 C.F.R. § 235.3(b)(4). Shanahan Decl. ¶ 29. The morning of the interview, at 8:22 a.m. on April 8, 2026, USCIS called Mr. Elgendy's attorney, Mr. Peng, to inform him that the interview would be taking place and to see if Mr. Peng would attend. Dkt.

---

[3] DHS sent I-241 requests for travel documents to Tunisia, Sweden, and the Netherlands on April 22, 2025, but all countries denied the requests. Dkt. No. 4-2 ("EDVA R&R") at 2; Pet. ¶ 31.

No. 4-8 ("Peng Decl.") ¶ 2.  When Mr. Peng indicated he wished to attend the interview, the USCIS officer told him that he needed to file his attorney notice of appearance in order to attend, which he did by 9:15 a.m.  *Id.* ¶ 2–4.  At the same time, Mr. Peng provided the USCIS official with a number of time slots in which he would be available to attend the interview, including after 4:00 p.m. that same day.  *Id.* ¶ 4.  Nevertheless, USCIS called him five times between 10:13 a.m. and 10:29 a.m., which Mr. Peng was unable to answer due to prior professional commitments.  However, he responded via email at 10:33 a.m. that he was unable to attend until 4:00 p.m. that day and asked for the interview to accommodate that timeline or one of the other dates and times provided.  *Id.* ¶ 5–6.  Despite Mr. Peng's efforts to ensure that Mr. Elgendy had the assistance of counsel, Mr. Elgendy twice consented to proceed with the credible fear interview without counsel, and it went forward at around 10:30 a.m.  Pet. ¶ 39; Shanahan Decl. ¶ 29; Dkt. No. 12-8 (USCIS Interview).  Following the interview, on the same day, USCIS issued a negative credible fear finding, finding that Mr. Elgendy "did not establish that it is more likely than not that [he] will be persecuted or tortured in Equatorial Guinea."  Pet. ¶ 40; Dkt. No. 12-9 (Third Country Screening Notice); Dkt. No. 12-10 (Third Country Worksheet).

On April 14, 2026, Judge Allen issued a final order accepting Magistrate Judge Krask's March 9, 2026 unobjected-to findings and recommendations, granting Mr. Elgendy's Petition, and ordering his release under the *Zadvydas* framework.  Pet. ¶ 32; Dkt. No. 4-2 (EDVA R&R); Dkt. No. 4-3 (EDVA Final Order).  Mr. Elgendy was released from custody the next day on an Order of Supervised Release ("OSUP") and, with DHS's permission, changed his address to Queens, New York.  Pet. ¶ 33–34; Dkt. No. 12-11 (OSUP).  Mr. Elgendy attended all appointments required by the terms of his OSUP since his release.  Pet. ¶ 34;

4

On the same day that Judge Allen's Order issued, the Government sought vacatur of the prior EDVA order enjoining Mr. Elgendy's removal or transfer from EDVA because it represented that it had made arrangements to remove him to Equatorial Guinea during the week of April 27, 2026.  Dkt. No. 4-10.  Over Mr. Peng's objections that Mr. Elgendy was not provided sufficient process prior to third country removal, the EDVA court granted the Government's request to vacate on April 27, 2026, based on the Government's representations. *Id.*; Dkt. No. 4-5 ¶ 6.  Mr. Elgendy was not detained at that time or removed to Equatorial Guinea during the week of April 27, as the Government had represented to Judge Allen.

On June 1, 2026, ICE was informed that Mr. Elgendy could be removed to Equatorial Guinea on a flight scheduled for June 16, 2026.  Shanahan Decl. ¶ 32.  On Form 71-091, ICE noted that circumstances had changed "such that there is a significant likelihood of removal in the reasonably foreseeable future," which provided the basis for the revocation of Mr. Elgendy's OSUP.  Dkt. No. 12-15 (Form 71-091, OSUP Revocation).

On June 4, 2026, pursuant to an I-205 Warrant, ICE conducted a targeted action to arrest Mr. Elgendy and found him exiting the residential address on Long Island, New York that he had provided to ICE in connection with his OSUP supervision.  Shanahan Decl. ¶ 33–34; Dkt. No. 12-13 (Form I-213); Dkt. No. 12-14 (Form I-205 Warrant).  Mr. Elgendy was arrested and transported to 26 Federal Plaza for processing, where he was served with the Notice of Revocation of Release, the I-205 Warrant, an Online Detainee Locator System Privacy Notice, a notice of his right to request consular notification, a Form I-294, a Form I-200, and a Notice of Fee Assessment.  Shanahan Decl. ¶ 34–35.  Mr. Elgendy was also given an informal interview to allow him to respond to the reasons for his OSUP revocation.  Dkt. No. 12-17 (Informal Interview).

## II.    PROCEDURAL HISTORY

Petitioner filed the present writ for habeas corpus on the same day as his re-detention. Dkt. No. 1.  This Court issued an Order to Show Cause ordering briefing on the Petition, setting a hearing for June 15, 2026 (later adjourned to June 18, 2026 at the parties' request), and enjoining Petitioner's removal during the pendency of the Petition.  Dkt. No. 2; Dkt. No. 10.

At the June 18 hearing, the Court found that the record was insufficient to issue a ruling, and that a number of legal and factual issues relevant to resolving the Petition had not been briefed by the parties, given the necessary haste with which the Petition had been prepared and briefed.  The Court ordered supplemental briefing.  *See* Dkt. Nos. 17–20.  Both parties filed supplemental briefs on July 20, 2026, and Petitioner filed a response to the Government's supplemental brief on July 27, 2026.  Dkt. Nos. 27–29.  The issues are now fully briefed and properly before the Court.

## DISCUSSION

The basis for the revocation of Mr. Elgendy's OSUP and his re-detention was the Government's representation that his lawful removal to Equatorial Guinea was imminent. Because the present record does not reflect that DHS adequately considered each country it was required to consider under 8 U.S.C. § 1231(b)(2) before identifying Equatorial Guinea as the destination country for Petitioner's removal, Mr. Elgendy's current detention is unlawful and a violation of his due process rights.  As a result, Mr. Elgendy's Petition is GRANTED in part and he is ORDERED released on the same terms as set forth in his April 15, 2026 Order of Supervised Release ("OSUP").  *See* Dkt. No. 12-11.

6

## I.      LEGAL STANDARD ON A SECTION 2241 HABEAS PETITION

A court may grant a writ of habeas corpus if a petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." *Wang v. Ashcroft*, 320 F.3d 130, 140 (2d Cir. 2003) (quoting 28 U.S.C. § 2241).[4]  All persons in the United States, non-citizens included, have a right to due process under the Fifth Amendment without regard to "whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).  If the Government's violation of its own laws or regulations culminates in a non-citizen's detention, due process may require that person's release from custody.  *See E.M.M. v. Almodovar*, No. 25-CV-08212 (MMG), 2025 WL 3077995, at *4 (S.D.N.Y. Nov. 4, 2025); *Chipantiza-Sisalema v. Francis*, No. 25-CV-05528 (AT), 2025 WL 1927931, at *3 (S.D.N.Y. July 13, 2025).

Habeas corpus is an "adaptable remedy," *Boumediene v. Bush*, 553 U.S. 723, 779 (2008), and its "equitable and flexible nature . . . gives the reviewing court considerable latitude to correct errors that occurred during the prior proceedings," *Velasco Lopez v. Decker*, 978 F.3d 842, 855 (2d Cir. 2020).

## II.     THE GOVERNMENT'S FAILURE TO FOLLOW 8 U.S.C. § 1231(B)(2)'S SEQUENCING COMMAND NECESSITATES PETITIONER'S RELEASE

Petitioner asserts that he has a liberty interest in being "removed to the countries of removal designated on [his] order[] of removal or otherwise pursuant to the sequencing requirements of 8 U.S.C. § 1231(b)(2)" and that the Government's failure to follow Section 1231's sequencing here violates his due process rights and the INA.[5]  Pet. ¶¶ 57–59, 64–69; Dkt.

---

[4] Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes and omissions, and adopt alterations.

[5] Mr. Elgendy has raised a number of arguments in support of his Petition, including in supplemental briefing.  Although the Court has considered those other arguments, because the Court is granting the Petition based solely on the Government's failure to comply with the commands of 8 U.S.C.

No. 29 ("Pet. Suppl. Opp."), at 1.  The Government does not contest that it is required to follow

Section 1231's sequencing, but argues that immigration officials adequately considered and

eliminated all other options for removal before arriving at Equatorial Guinea under 8 U.S.C.

§ 1231(b)(2)(E)(vii).  Dkt. No. 27 ("Gov. Suppl. Br."), at 6–8.[6]

Because the record before the Court does not reflect that DHS properly considered other

countries ahead of Equatorial Guinea, the revocation of Petitioner's OSUP and his subsequent

detention lacks a lawful basis and accordingly does not comport with due process.

**A. The Government Is Required to Abide by 8 U.S.C. § 1231(b)(2) in Identifying a Country for Removal**

Mr. Elgendy was encountered by immigration officials once he was already in the United

States, and his Notice to Appear marks him as an "alien present in the United States who has not

been admitted or paroled," rather than an "arriving alien."  Shanahan Decl. ¶ 4; Dkt. No. 12-2

(Notice to Appear).  Thus, because Mr. Elgendy is not considered an "alien[] arriving" at the

United States, 8 U.S.C. § 1231(b)(2) governs the sequence DHS must adhere to in identifying a

country for his removal.  *See Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 337 (2005)

("When an alien is found ineligible to remain in the United States, the process for selecting the

country to which he will be removed is prescribed by 8. U.S.C. § 1231(b)(2).").

---

§ 1231(b)(2), and in the interest of effectuating Mr. Elgendy's prompt release, this analysis will address only that argument.  *See e.g.*, *Roman-Cruz v. Lyons*, No. 25-CV-10522 (RA), 2026 WL 114936, at *2 (S.D.N.Y. Jan. 15, 2026) (declining to reach other arguments where ordering release).

[6] Responding directly to the Court's inquiry at the June 18 hearing, the Government's supplemental briefing focused on the possibility that Mexico was overlooked by DHS in its § 1231(b)(2)(E) evaluation.  *See* Gov. Suppl. Br. at 6.  At the time of the hearing, the Court's inquiry was limited to Mexico because the record did not identify any other countries that Mr. Elgendy had traveled to and, indeed, counsel were unaware of any others.  *See* Dkt. No. 25 at 19–20.  With the Government's supplemental briefing, it submitted a transcript of Mr. Elgendy's EOIR Merits hearing, *see* Dkt. No. 27-2, which revealed a long list of countries that Mr. Elgendy entered on his journey to the United States. Nevertheless, the Government maintains that "Equatorial Guinea is the correct country of removal" because Mr. Elgendy's removal to Egypt, the "only other country that qualifies under the statute" is withheld.  Gov. Suppl. Br. at 7–8.

As summarized by the Supreme Court in *Jama*, Section 1231(b)(2) provides "four consecutive removal commands" for designating a country of removal. *See id*. at 341. At step one, a non-citizen "shall be removed to the country of his choice (subparagraphs (A) to (C)), unless one of the conditions eliminating that command is satisfied." *Id.* "[O]therwise," at step two, the non-citizen "shall be removed to the country of which he is a citizen [or subject or national] (subparagraph (D)), unless one of the conditions eliminating that command is satisfied." *Id.* "[O]therwise," at step three, the non-citizen "shall be removed to one of the countries with which he has a lesser connection," which include those described in clauses (i) to (vi) to subparagraph (E). *Id.* Those step-three countries include:

- "The country from which the alien was admitted to the United States," 8 U.S.C. § 1231(b)(2)(E)(i);

- "The country in which is located the foreign port from which the alien left for the United States or for a foreign territory contiguous to the United States," 8 U.S.C. § 1231(b)(2)(E)(ii);

- "A country in which the alien resided before the alien entered the country from which the alien entered the United States," 8 U.S.C. § 1231(b)(2)(E)(iii);

- "A country in which the alien was born," 8 U.S.C. § 1231(b)(2)(E)(iv);

- "The country that had sovereignty over the alien's birthplace when the alien was born," 8 U.S.C. § 1231(b)(2)(E)(v); and

- "The country in which the alien's birthplace is located when the alien is ordered removed," 8 U.S.C. § 1231(b)(2)(E)(vi).

Only <u>after</u> each country at steps one, two, and three—including each country described in clauses (i)-(vi) to subparagraph (E)—have been considered and disqualified may the Government move on to clause (vii), subparagraph (E)'s catch-all provision: "another country whose government will accept the alien into that country." 8 U.S.C. § 1231(b)(2)(E)(vii). Indeed, the Supreme Court made crystal clear that "[c]lauses (i) through (vi) come first—in the statute and in the process of selecting a country," and can only be disqualified upon a finding that

9

removal to those countries would be "impracticable, inadvisable, or impossible." *Jama*, 543 U.S. at 341–42.

**B. There Is No Evidence that DHS Adequately Considered Higher-Priority Countries to Equatorial Guinea Before Revoking Petitioner's OSUP and Detaining Him**

Despite 8 U.S.C. § 1231(b)(2)'s clear command, there is no evidence on the present record that DHS considered and disqualified countries higher-in-line to Equatorial Guinea under the statute—which, in Mr. Elgendy's case, could be designated as a country of removal only under 8 U.S.C. § 1231(b)(2)(E)(vii), the clause of last resort.

As just one example of the gap in the record, 8 U.S.C. § 1231(b)(2)(E)(iii) designates "[a] country in which the alien resided before the alien entered the country from which the alien entered the United States" as countries of removal that would take priority over a (vii) country. The transcript from Mr. Elgendy's Executive Office for Immigration Review ("EOIR") Merits interview, submitted as Exhibit B to the Government's supplemental brief, *see* Dkt. No. 27-2,[7] reveals a host of countries Mr. Elgendy traveled to since departing from Egypt.[8] After leaving Egypt, Mr. Elgendy traveled to Mauritania, where he obtained a visa at the entry port and stayed for around 30 days; Senegal for 18 days; Morocco and Madrid for a few hours in "transit"; El Salvador, Nicaragua, Honduras, and Guatemala for an unknown period of time; and Mexico for 15 days. *Id.* at 39–41.

The INA defines "residence" as "the place of general abode" and states that "the place of general abode of a person means his principal, actual dwelling place in fact, without regard to

---

[7] On August 11, 2026, at the request of the Court, the Government submitted the full and unredacted version of the transcript to the Court via email.

[8] Both parties acknowledge that the answer to a number of the other 1231(b)(2)(E) clauses is Egypt, a country to which the Petitioner cannot be removed.

intent." 8 U.S.C. § 1101(a)(33).  In other words, neither intent to remain nor an absence of intent to remain are elements of the INA's definition of residence.  There is no evidence before the Court that anyone at DHS grappled with this definition or considered whether any of the numerous countries Mr. Elgendy stayed in between his departure from Egypt (his country of citizenship and birth) and his arrival in the United States may qualify as a country where he "resided" under Section 1231(b)(2)(E)(iii).[9]  The Court need not decide that question:  the only relevant question is whether DHS engaged in that exercise before it represented that Petitioner's OSUP could be revoked and he could be detained based on lawful imminent removal.  The Court finds it did not, and nowhere in briefing on the present Petition does the Government attempt to represent otherwise.[10]

## C.  The Proper Remedy is Release

A deprivation of liberty in violation of clear legal requirements violates a petitioner's procedural due process rights.  DHS's stated basis for the revocation of Mr. Elgendy's OSUP

---

[9] The Court has identified no case that would definitively establish that Mauritania, Senegal, Nicaragua, etc. could not qualify as countries where Petitioner "resided" under the facts of this case, such that DHS could be excused from considering them as countries potentially in the required sequence of consideration under Section 1231(b)(2)(E).

[10] To the extent the Government's arguments as to § 1231(b)(2)(E)(ii) were intended as arguments applying to § 1231(b)(2)(E)(iii), they fail.  In that case, the Government suggests that because it appears Petitioner had planned to end up in the United States from Egypt, Mr. Elgendy cannot be said to have "resided in" any of the countries he visited on his journey.  *See* Gov. Suppl. Br. at 7.  Even if the Court were to accept that Petitioner's destination was pre-planned and inevitable, that argument ignores Section 1101(a)(33)'s clear command that "residence" is defined *"without regard to intent*."  8 U.S.C. § 1101(a)(33) (emphasis added); *see also Leong Leun Do v. Esperdy*, 309 F.2d 467, 471 (2d Cir. 1962) (referencing § 1101(a)(33)'s definition and considering a noncitizen who remained in the Dominican Republic on a "businessman's visa" for 11 months a "resident" of that land (rather than being "firmly resettled" there, which the court held was not required)); *Strupp v. Herter*, 180 F. Supp. 440, 442–43 (S.D.N.Y. 1960) (acknowledging that intent to remain is not a factor for determining residence in the immigration context, in contrast to other areas of law); *Ashton v. Gonzales*, 431 F.3d 95, 98 (2d Cir. 2005) (finding that in the context of fulfilling requirement to maintain residence in the United States to obtain citizenship, a "subjective intent" to remain in the U.S. coupled with physical presence in the U.S. was insufficient in part given § 1101's definition of "residence").

and his re-detention was their identification of Equatorial Guinea as a country who would imminently accept his removal, and to which it was lawful to remove him.  Because the INA is clear that DHS was required to consider and eliminate a host of other countries before arriving at Equatorial Guinea, and there is no record that it did so, Mr. Elgendy's detention is unlawful from its inception.  As other courts in this district have ruled, the proper remedy where the Government detains an individual in violation of laws that bind its procedures for doing so is the individual's immediate release.  *See e.g.*, *E.M.M.*, 2025 WL 3077995, at *4; *Zhu v. Genalo,* 798 F. Supp. 3d 400, 414 (S.D.N.Y. 2025); *Liu v. Genalo*, No. 26-CV-03720 (AT), 2026 WL 1383370, at *5 (S.D.N.Y. May 14, 2026).

Accordingly, Mr. Elgendy must be released while DHS undergoes the analysis delineated in 8 U.S.C. § 1231(b)(2).  For the avoidance of doubt, this Opinion is not a final ruling on whether Equatorial Guinea may ultimately be an appropriate or lawful country for Mr. Elgendy's removal.[11]  But before making that decision, DHS must undertake, in good faith, the analysis and sequencing required by Section 1231.

---

[11] In addition, if Mr. Elgendy wishes to file a motion before an Immigration Judge to re-open his removal proceedings to challenge the designation of Equatorial Guinea, or to re-assert his right to name a country of removal of his choosing, or to challenge his deprivation of counsel for his April 8, 2026 credible fear interview, he may do so, and nothing in this Opinion is intended to prevent or discourage the filing of such a motion seeking relief from the immigration court.

## CONCLUSION

For the foregoing reasons, the Court GRANTS Mr. Elgendy's Petition in part.  The Government is hereby ORDERED to release Mr. Elgendy from custody, under the terms of his April 15, 2026 OSUP, *see* Dkt. No. 12-11, immediately, and by no later than **tomorrow**, **August 14, 2026**, at **5:00 p.m**.  The Government is further ORDERED to file a letter certifying compliance with this Court's Order by no later than **August 17, 2026**.

Dated:  August 13, 2026
New York, New York

SO ORDERED.

_____
MARGARET M. GARNETT
United States District Judge

13